CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
August 19, 2026
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **CARL W. GRIFFIN,** | ) | |
| **Plaintiff,** | ) | **Case No. 7:25-cv-00365** |
| | ) | |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **CHADWICK DOTSON, et al.,** | ) | **Senior United States District Judge** |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

Carl W. Griffin, a state inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 against twenty individuals employed by the Virginia Department of Corrections (VDOC). Griffin asserts claims for denial of due process arising from the adjudication of disciplinary charges that were issued against him while he was housed at Keen Mountain Correctional Center (KMCC). He also asserts federal constitutional claims stemming from his subsequent placement in solitary confinement in the Step-Down Program at Red Onion State Prison (ROSP) and the denial of his request for a no-kneel pass while in solitary confinement.

The case is presently before the court on the defendants' motion for summary judgment. ECF No. 23. The defendants argue that they "did not violate Griffin's due process rights with respect to the adjudication of his disciplinary charges" and that "Griffin failed to exhaust available administrative remedies with respect to his claims regarding his placement and conditions in the [Step-Down Program]." Defs.' Br. Supp. M. Summ. J., ECF No. 24, at 13 and 16. Griffin has responded to the motion, ECF No. 33, and the motion is

ripe for review. For the following reasons, the motion for summary judgment is **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**.

## I. Background

### A. Summary of Griffin's Claims

Griffin is an inmate in the custody of the VDOC. At all times relevant to this action, Griffin was housed at KMCC and ROSP. He names the following individuals as defendants: former VDOC Director Chadwick Dotson; KMCC Warden Israel Hamilton; KMCC Correctional Officer J. Matney; ROSP Correctional Officer M. Farmer; ROSP Inmate Hearings Officer K. Ramey; KMCC Inmate Hearings Officer M. Cordle; KMCC Captain C. McBride, KMCC Correctional Sergeant J. Perkins; Registered Nurse L. Holbrook; Health Authority D. Trent; Grievance Coordinator T. Still; Regional Ombudsman Cathy Meade; ROSP Assistant Warden and former Chief of Housing and Programs Amee Duncan; Legal Compliance Manager Erica Westfield; Chief of Corrections Operations A. David Robinson; Senior Deputy Joseph W. Walters; Chief of Administrative Compliance Ryan C. McCord; Regional Administrator Thomas Meyer; Director of Security and Correctional Enforcement Randall C. Mathena; and Chief of Restorative and Diversionary Housing Lois Fegan.

The defendants construed Griffin's verified complaint to assert the following claims:

Claim 1: Defendants Matney and Farmer failed to give proper notice of the disciplinary charges and associated disciplinary hearings, in violation of Griffin's Fourteenth Amendment right to procedural due process.

Claim 2: Defendants Perkins, McBride, Cordle, and Ramey failed to follow proper procedures with respect to the service and adjudication of Griffin's disciplinary charges, in violation of his Fourteenth Amendment right to procedural due process.

Claim 3: Defendants Westfield, McCord, Walters, Robinson, Cordle, and Ramey failed to ensure that Griffin's due process rights were protected during the adjudication of his disciplinary charges, in violation of his Fourteenth Amendment right to procedural due process.

Claim 4: Defendant Hamilton failed to respond to Griffin's appeals of his disciplinary convictions, in violation of his Fourteenth Amendment right to procedural due process.

Claim 5: Defendants Robinson, Hamilton, and Dotson failed to supervise their subordinates with respect to the administration of Griffin's disciplinary charges, thereby causing violations of his Fourteenth Amendment right to procedural due process.

Claim 6: Defendants Duncan, Robinson, Meyer, Fegan, and Mathena implemented inadequate policies for housing inmates in the VDOC's Step-Down Program, failed to properly administer the Step-Down Program, and knowingly caused Griffin to experience adverse mental health effects by virtue of being housed in the Step-Down Program, in violation of Griffin's First, Eighth, and Fourteenth Amendment rights.

Claim 7: Defendants Holbrook, Still, Trent, and Meade acted with deliberate indifference in violation of the Eighth Amendment by failing to provide Griffin with a no-kneel pass.

Defs.' Br. Supp. Mot. Summ. J. at 1–2 (citing Compl., ECF No. 1, ¶¶ 79–87). Griffin seeks monetary damages and equitable relief. Compl. at 24–25.

**B. Evidence Relevant to Griffin's Disciplinary Charges and Subsequent Placement in Solitary Confinement**

On the morning of November 23, 2024, Griffin was involved in an altercation with at least three other inmates at KMCC during which he was stabbed in the head and mouth. Compl. ¶¶ 1–2, ECF No. 1 at 8.[1] He was subsequently taken by ambulance to Clinch Valley Medical Center, where he was seen in the emergency department for several medical issues,

[1] The complaint contains multiple paragraphs with the same number. When citing to one of those paragraphs, the court will also reference the page number assigned by the court's CM/ECF system.

including "amnesia to events," left-sided facial contusion and swelling, facial trauma, lacerations, and a scalp hematoma. Pl.'s Aff. Encl. C1-C9, ECF No. 33-4 at 86. When Griffin returned to KMCC later that day, medical staff noted that he was unable to tell them where he was; that his pupils were unreactive to light; that the left side of his face and neck were swollen; and that he was constantly drooling and unable to close his mouth. Id. at 88. A nurse practitioner advised the medical staff to perform "neuro checks" every thirty minutes for two hours, followed by hourly checks, and to send Griffin back to the hospital if his condition did not improve. Id. During various checks, medical staff noted that Griffin exhibited "confusion" and "drowsiness" and that he was "not arousable." Id. at 90.

That same day, Sergeant J. Perkins charged Griffin with the disciplinary offense of physical assault upon or altercation with an inmate resulting in serious bodily harm (VDOC Offense Code 105B). Perkins reported that the altercation occurred in a dayroom at KMCC at approximately 6:47 a.m. on November 23, 2024; that Griffin assaulted another inmate resulting in serious bodily harm; and that Griffin used a homemade weapon during the assault. Perkins wrote the charge at 4:05 p.m., and the charge was assigned Case No. KMCC-2024-3258. Captain C. McBride reviewed and approved the charge at 4:34 p.m. on November 23, 2024. Cordle Aff. Encl. B, ECF No. 26 at 38.

Perkins also charged Griffin with the disciplinary offense of possession or use of a weapon, sharpened instrument, ammunition, explosive, or incendiary device (VDOC Offense Code 102A). Perkins reported that Griffin was found to be in possession of a weapon when Perkins responded to a fight between Griffin and another inmate; that the weapon had been used in the altercation; and that Griffin admitted that the weapon

belonged to him and that he had used it. Perkins wrote this charge at 4:36 p.m., and the charge was assigned Case No. KMCC-2024-3260. Captain C. McBride reviewed and approved the charge at 4:54 p.m. on November 23, 2024. Cordle Aff. Encl. C, ECF No. 26 at 46.

Correctional Officer J. Matney was responsible for serving Griffin with copies of both disciplinary offense reports. Although Matney does not recall what specifically occurred, Matney signed and initialed sections of the reports indicating that Griffin had been advised of his procedural rights but refused to sign and acknowledge that he had been informed of those rights and the charges against him. Cordle Aff. Encls. B and C, ECF No. 26 at 38 and 46. Griffin, on the other hand, denies receiving copies of the disciplinary offense reports. Compl. ¶ 17, ECF No. 1 at 10. Griffin maintains that he was "medically unable to coherently understand or be aware of" the charges as a result of his severe head trauma, that he was "incapable of communication," and that he was "completely unaware of the alleged service and notice of [the] two major offense reports." Id. ¶¶ 9–12.

The hearings for both charges were originally scheduled for November 29, 2024. Cordle Aff. ¶ 9. As of that date, according to Griffin's sworn submissions, he had not received copies of the disciplinary offense reports and 'still did not know of [the] two offense reports." Compl. ¶ 18, ECF No. 1 at 10; see also Pl.'s Aff., ECF No. 33-3, ¶ 8 ("Between the dates of 11/23/24 and 11/29/24, Plaintiff did not receive copies of the two offense reports . . . .").

Griffin was transferred to ROSP on December 2, 2024. Cordle Aff. ¶ 11. On December 3, 2024, a notice of postponement was issued in both cases, indicating that the

disciplinary hearing for each charge had been rescheduled for December 5, 2024. Cordle Aff. Encl. B and C, ECF No. 26 at 42 and 50. According to the notice of postponement reports, Correctional Officer Farmer served the notices of postponement on Griffin at 11:17 p.m., and Griffin "refused to sign" for them. Id. However, Farmer has no recollection of what specifically occurred when he attempted to serve the notices. Farmer Aff., ECF No. 24-3, ¶ 6.

The disciplinary hearing for each charge was then postponed until December 13, 2024. On December 11, 2024, Griffin signed the respective notice of postponement for each case. Cordle Aff. Encl. B and C, ECF No. 26 at 43 and 51. Griffin alleges that he subsequently sent Hearings Officer Ramey two request forms indicating that he had not received copies of the disciplinary offense reports and that he "received no response" to the request forms. Compl. ¶ 23.

Hearings Officer Cordle proceeded to conduct both disciplinary hearings by phone from KMCC on December 13, 2024. Cordle maintains that he did not receive any requests for witnesses or documentary evidence from Griffin prior to the hearings. Cordle Aff. ¶ 12, and a correctional officer signed forms indicating that Griffin had refused to appear, Cordle Aff. Encl. B and C, ECF Nos. 44 and 52. Griffin, however, maintains that he was "not called" for the hearings conducted on December 13, 2024, and that he received "no opportunity to marshal facts or properly defend himself." Compl. ¶ 24.

Cordle found Griffin guilty of the offense charged in each disciplinary case. For the assault charge in Case No. KMCC-2024-3258, Cordle imposed as a penalty the loss of phone privileges for 120 days. Cordle Aff. Encl. B, ECF No. 26 at 39. For the weapon charge in

Case No. KMCC-2024-3260, Cordle imposed a fine of $25.00 Cordle Aff. Encl. C, ECF No. 26 at 47.

On December 23, 2024, Griffin signed an appeal sheet acknowledging that he had received the disciplinary offense report, disposition, and appeal forms in each disciplinary case. According to Griffin, this was the "first time" he had received copies of the disciplinary offense reports and other forms indicating that he had purportedly refused to sign certain forms or appear for the hearings. Compl. ¶ 26.

Although Cordle's affidavit indicates that KMCC has no record of receiving any disciplinary appeal, Griffin maintains that he submitted timely disciplinary appeals to Warden Hamilton on December 27, 2024, and that he did not receive a response to either appeal. Compl. ¶¶ 27–28. Griffin further avers that he appealed to the Inmate Disciplinary Unit and that he did not receive a response. Id. ¶ 29.

On December 19, 2024, Griffin appeared before the Institutional Classification Authority (ICA) for a security level review. Pl.'s Aff. Encl. G, ECF No. 33-4 at 110. On December 20, 2024, the ICA recommended that Griffin's security level be changed to Level S (Segregation) for the following reasons:

> On November 23, 2024, Inmate Griffin assaulted another inmate with a homemade weapon at Keen Mountain Correctional Center. Griffin was participating in pod recreation when he attacked another inmate with a homemade sharpened piece of metal. Due to the injuries sustained during the assault the inmate was transferred to an offsite medical facility. Inmate would benefit from the more secure and structure[d] environment and self-change programs.

Id. The recommendation was approved by Amee Duncan on December 22, 2024, and by Thomas Meyer on January 7, 2025. Id. Griffin alleges that he began his "indefinite time [in]

solitary confinement" as part of the VDOC's Step-Down Program on January 10, 2025. Compl. ¶ 34; see also Pl.'s Aff. ¶ 16 ("On 1/10/25, Plaintiff [was] sent to C-311 for (stepdown) Level S.").

### C. Evidence Relevant to the Defense of Failure to Exhaust Administrative Remedies

#### 1. The Inmate Grievance Procedure

The VDOC has established a grievance procedure for inmates that is set forth in VDOC Operating Procedure (OP) 866.1. Still Aff., ECF No. 24-4, ¶ 4. Grievable issues include actions of staff that affect an inmate personally and "[c]onditions of care under the authority of the DOC." OP 866.1 § III(B)(1) (eff. July 1, 2024, amended Aug. 1, 2024), Still Aff. Encl. A, ECF No. 24-4. Non-grievable issues include "[d]isciplinary hearing decisions, penalties, and/or procedural errors, which may be appealed in accordance with Operating Procedure 861.1." Id.

Pursuant to OP 866.1, inmates must first attempt to resolve a grievable issue informally before filing a regular grievance. If a verbal complaint is not resolved to the inmate's satisfaction, the inmate may submit an informal written complaint. Id. § II(B). The written complaint "must be received by the Institutional Ombudsman within 15 days of the original incident or discovery of the incident." Id. Within two working days of receiving a written complaint, staff must log the complaint, print a grievance receipt, and provide the inmate with the receipt as notification of acceptance. Id. Following the logged receipt of a written complaint, staff have 15 days to provide an appropriate response. Id. If a staff member fails to provide a written response within 15 days or if the inmate is dissatisfied with the response, the inmate may file a regular grievance. Id. § III(A).

Regular grievances must be submitted within 30 days from the date of the incident or the discovery of the incident, absent injury, sickness, or some other circumstance beyond an inmate's control. Id. § III(B). Following the submission of a regular grievance, the institutional ombudsman has two days to accept or reject it. Id. § III(C). If a regular grievance satisfies the intake criteria, the institutional ombudsman must accept the grievance, log it into VACORIS, and issue a grievance receipt within two working days. Id. If the grievance does not meet the intake criteria, the institutional ombudsman has two working days to return the grievance to the inmate with an explanation for its rejection. Id. If an inmate disagrees with an intake decision, the inmate may appeal the decision within five days. Id.

When a regular grievance is accepted during the intake process, the warden or assistant warden is responsible for providing a Level I response within 30 days of the issuance of the grievance receipt. Id. § III(F). If an inmate is dissatisfied with the response, the inmate may submit a grievance appeal to Level II within five days of receiving the Level I response. Id. § IV(B).

OPP 866.1 indicates that an inmate must exhaust all of the requirements of the grievance procedure before seeking judicial relief. Id. § V(A). The exhaustion requirement is satisfied when a regular grievance "has been accepted into the grievance process and appealed, without satisfactory resolution of the issue." Id. § V(B).

**B. Griffin's Grievance Filings**

**1. Filings Related to a No-Kneel Pass**

On December 30, 2024, Griffin signed a facility request form requesting "medical services" and an "appointment." Pl.'s Aff. Encl. E1-E6, ECF No. 33-4 at 99. The form included the following summary:

> I have a degenerative bone along my spine in the lower lumbar region in my lower back. This is causing me severe pain and I have very limited movement up and down. I am in segregation/solitary confinement and I shall be for some time to come. As they have a kneel policy this has put a tremendous amount of strain on this debilitating injury and I have fallen down or required help kneeling by officers. But the strain is growing worse as my back brace is in my property and I still have not been given my property. I really need a kneeling exemption as this would greatly improve my quality of life. Thank you.

Id. The request was stamped "received" by the medical department on December 31, 2024, and an unidentified staff member responded that Griffin would be scheduled with a provider. Id.

On February 3, 2025, Griffin signed a written complaint addressed to "medical." Still Aff. Encl. B, ECF No. 24-4 at 27. Griffin alleged that it was "impossible for [him] to bend down on [his] knees" because of the pain and discomfort in his lower spine and that his inability to kneel had prevented him from leaving his cell to take showers, have recreation time, and use the kiosk. Id. On February 18, 2025, Registered Nurse D. Trent responded that Griffin had "rejected" an appointment with a VCU orthopedic specialist in July 2023 and that he had "not requested a sick call for this [issue]." Id.

On February 21, 2025, Griffin signed a regular grievance alleging that he had "put a sick call form in concerning getting a 'no kneel' pass" more than "a month and a half ago" and that he had been "seen by NP Holbrook who was accompanied by Medical Officer

Mullins." Id. at 25. Griffin reported that Holbrook denied his request and told him that "she would have to give one to everybody" if she issued Griffin a no-kneel pass. Id. Holbrook also suggested that Griffin did not have any degenerative problem in his lower back. Id. Griffin emphasized that he told Holbrook that "everyone is not in long term solitary confinement, so everyone does not have to kneel" to leave their cell and that his "diagnosis could be confirmed by reviewing [his] medical files." Id. Griffin asserted that Holbrook's denial of his request for a no-kneel pass was "very flawed and lacked an actual medical assessment"; that it was "impossible" for him to kneel due to constant pain and discomfort; and that he could therefore not leave his cell for showers, recreation time, or to use the kiosk. Id. Griffin listed "medical" as the "individuals involved" in the incident and asked that he be issued a no-kneel pass so that he could shower, go to recreation, and communicate with his family. Id.

On February 25, 2025, Institutional Ombudsman T. Still rejected the grievance at intake as a "Request for Services." Id. at 26. Still directed Griffin to "submit sick call to discuss with provider." Id. Griffin appealed the intake decision, and on February 28, 2025, Regional Ombudsman Cathy Meade affirmed the decision. Id.

### 2. Filings Related to Mental Health Concerns

On February 3, 2025, Griffin submitted a written complaint directed to "mental health." Still Aff. Encl. C, ECF No. 24-4 at 33. Griffin alleged that he had been struggling with irritability, difficulty sleeping, anxiety, and feelings of loneliness, and that he had been submitting request forms with no response for approximately two months. Id. He requested to "talk through this to see if there are any coping mechanisms" that might assist him. Id.

On February 12, 2025, Senior Mental Health Clinician E. Creech responded that another mental health counselor had spoken with Griffin that day regarding his concerns. Id.

On February 20, 2025 Griffin submitted a regular grievance against "mental health." Id. at 31. He reported that had still not seen a psychologist and that he had only been given a questionnaire to answer. Id. He noted that he was "getting worried about [his] mental wellbeing" and asked that be afforded the opportunity to speak to a psychologist. Id.

The regular grievance was accepted at intake and referred to Creech for an investigation. Id. at 29. Creech indicated that Griffin should speak to his mental health clinician about coping skills, that the psychiatrist was only at ROSP twice a week, and that Griffin was scheduled to see the psychiatrist in March. Based on the information provided by Creech, the grievance was determined to be "unfounded." Id. Griffin appealed the Level I response, and the response was affirmed by the Level II respondent on April 15, 2025. Id. at 28.

**3. Absence of Filings Specifically Pertaining to Griffin's Placement in the Step-Down Program**

Although Griffin's request for a no-kneel pass mentioned the fact that he was in solitary confinement, the defendants' evidence indicates that Griffin did not submit any written complaints or regular grievances alleging that he was improperly placed in long-term segregation or solitary confinement as part of the Step-Down Program at ROSP, that he was unable to progress through the program, or that his mental health symptoms were caused by his placement in the program. See Still. Aff. ¶ 17; see also Still Aff. Encl. D, ECF No. 24-4 at 34–43 (inmate grievance report summarizing written complaints and regular grievances filed by Griffin prior to the commencement of this action).

## II. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To survive summary judgment, there must be sufficient evidence from which a reasonable finder of fact could return a verdict in the nonmoving party's favor. Id. at 252. "Conclusory or speculative allegations do not suffice to oppose a properly supported motion for summary judgment, nor does a mere scintilla of evidence." Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (internal quotation marks omitted).

## III. Discussion

The defendants have moved for summary judgment on the merits of Griffin's procedural due process claims arising from the adjudication of the disciplinary charges brought against Griffin at KMCC (Claims 1 through 5). The defendants have moved for summary judgment on the defense of failure to exhaust administrative remedies with respect to Griffin's claims pertaining to his placement in solitary confinement as part of the Step-Down Program and the denial of his request for a no-kneel pass (Claims 6 and 7). The court will address each set of claims in turn.

### A. Due Process Claims Arising from the Adjudication of Disciplinary Charges

The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const.

amend. XIV, § 1. "Determining whether a person's due process right has been violated is a two-step inquiry." Brown v. Stapleton, 142 F.4th 252, 255 (4th Cir. 2025). Courts "first ask whether the person has been deprived of a protected liberty or property interest." Id. If so, they "then ask whether the deprivation occurred without constitutionally sufficient process." Id.

Here, the defendants acknowledge that Griffin has a property interest in his prison trust account and, thus, that the assessment of a $25.00 fine deprived Griffin of that protected interest. See Defs.' Br. Supp. Mot. Summ. J. at 24 (citing Brown, 142 F.4th at 257). They argue, however, that Griffin received all of the process to which he was entitled in connection with the disciplinary charges and that they "cannot be found liable for Griffin's refusal to avail himself of this process." Defs.' Br. Supp. Mot. Summ. J. at 16. Because genuine disputes of material fact exist with respect to these issues, they cannot be resolved on summary judgment.

In Wolff v. McDonnell, 418 U.S. 539 (1974), "the Supreme Court considered how prison disciplinary hearings must be structured in order to comport with the demands of the Due Process Clause of the Fourteenth Amendment." Brown v. Braxton, 373 F.3d 501, 504 (4th Cir. 2004). "Wolff establishes that, at a minimum, an inmate must receive 'advance written notice of the claimed violation'; an opportunity 'to call witnesses and present documentary evidence'; and a 'written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken.'" Henderson v. Harmon, 102 F.4th 242, 248 (4th Cir. 2024) (quoting Wolff, 418 U.S. at 563, 566).

Although the defendants contend that "Griffin was given notice of his charges, an opportunity to request evidence and witnesses, and an opportunity to attend the hearings on the charges," Defs.' Br. Supp. Mot. Summ. J. at 16, Griffin's own sworn statements indicate that he did not receive copies of the disciplinary offense reports prior to the hearings on the charges, that he received "no opportunity to marshal facts or properly defend himself," that he was "never pulled to attend" the disciplinary hearings, and that he did not sign any form refusing to attend the hearings. Compl. ¶ 24; Pl.'s Aff. ¶ 12. Griffin's sworn statements are plainly sufficient to create a genuine factual dispute as to whether he received all of the procedural protections required by Wolff. See Gowen v. Winfield, 130 F.4th 162, 175–76 (4th Cir. 2025) ("Affidavits and verified complaints may not be cast aside at summary judgment, 'even affidavits that are uncorroborated, self-serving, or filed by pro se prisoners.'") (quoting Alexnder v. Connor, 105 F.4th 174, 183 (4th Cir. 2024)). Consequently, the defendants are not entitled to summary judgment on this issue.

Notably, however, "procedural errors in prison proceedings are subject to harmless-error review." Henderson, 102 F.4th at 248; see also Brown, 142 F.4th at 259 ("Having vacated the district court's dismissal at step one of the due process inquiry, we remand for the district court to conduct step two. In doing to, the district court should also assess whether any errors in Brown's disciplinary proceedings were harmless.") (emphasis added). And "in evaluating whether prison officials' failure to disclose or consider evidence was harmless, courts must determine whether the excluded evidence could have aided the inmate's defense." Lennear v. Wilson, 937 F.3d 257, 277 (4th Cir. 2019). In other words, the court must decide whether receiving adequate notice and an opportunity to present evidence

"would have made any difference to the proceeding." Henderson, 102 F.4th at 249 n.4. Because neither side has addressed whether any alleged procedural errors in Griffin's disciplinary proceedings were harmless, the defendants' motion for summary judgment is denied without prejudice with respect to the due process claims arising from the adjudication of the disciplinary charges (Claims 1 through 5).

**B. Exhaustion Defense Raised in Response to Other Claims**

In Claim 6, Griffin alleges that defendants Duncan, Robinson, Meyer, Fegan, and Mathena implemented inadequate policies for housing inmates in solitary confinement as part of the VDOC's Step-Down Program, failed to properly administer the program, and knowingly caused Griffin to experience adverse mental health effects, in violation of his rights under the First, Eighth, and Fourteenth Amendments. In Claim 7, Griffin asserts that defendants Holbrook, Still, Trent, and Meade acted with deliberate indifference in violation of the Eighth Amendment by failing to provide him with a no-kneel pass.

The defendants have moved for summary judgment on these claims on the basis that Griffin failed to exhaust available administrative remedies prior to filing suit, as required by the Prison Litigation Reform Act (PLRA). The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme has held that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." Porter v. Nussle, 534 U.S. 516, 532 (2002), and that "proper exhaustion" is required, which means that "a

prisoner must complete the administrative review process in accordance with applicable procedural rules, including deadlines, as a precondition for bringing suit in federal court," Woodford v. Ngo, 548 U.S. 91, at 88, 90 (2006).

The applicable procedural rules "are defined not by the PLRA, but by the grievance process itself." Jones v. Bock, 549 U.S. 199, 218 (2007). As a result, "[t]he level of detail necessary in a grievance to comply with the grievance procedure will vary from system to system and claim to claim." Id. As a general rule, "an inmate's grievance must at least 'alert[] the prison to the nature of the wrong for which redress is sought.'" Mack v. Loretto, 839 F.3d 286, 295 (3d Cir. 2016) (quoting Strong v. David, 297 F.3d 646, 650 (7th Cir. 2022)); see also Wilcox v. Brown, 877 F.3d 161, 167 n.4 (4th Cir. 2017).

The only exception to the PLRA's exhaustion requirement is "the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" Ross v. Blake, 578 U.S. 632, 648 (2016). "An administrative remedy is considered unavailable 'if a prisoner, through no fault of his own, was prevented from availing himself of it.'" Gowen, 130 F.4th at 176 (quoting Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008)). "This includes instances where: 1) the administrative procedure is 'a simple dead end'—in other words, the prison officials are 'unable or consistently unwilling to provide any relief'; 2) the process is 'so opaque' that it becomes practically 'incapable of use' such that 'no ordinary prisoner can discern or navigate it'; or 3) the prison "thwart[s] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. (quoting Ross, 578 U.S. at 643–44). "Failure to exhaust is an affirmative defense for which the [defendants] bear the burden of proof." Id.

### 1. Claims Against Duncan, Robinson, Meyer, Fegan, and Mathena

As noted above, Claim 6 includes federal constitutional claims asserted against Duncan, Robinson, Meyer, Fegan, and Mathena stemming from the implementation and administration of the Step-Down Program in which Griffin was placed in solitary confinement as a Level S inmate. Griffin asserts that these defendants failed to "properly and without harm administer the policy of solitary [confinement]" and that they knowingly caused Griffin to experience "mental health issues" as a result of "their policy of solitary confinement." Compl. ¶¶ 85–86.

Having reviewed the record, the court concludes that no genuine issue of material fact exists as to whether Griffin properly exhausted these particular claims against Duncan, Robinson, Meyer, Fegan, and Mathena. Although Griffin's regular grievance requesting a no-kneel pass mentioned that he was housed in long-term solitary confinement, that grievance was directed to defendant Holbrook and other members of the medical staff at Red Onion, and it contested the denial of Griffin's request for a no-kneel pass and the grounds for that decision. The grievance did not specifically challenge Griffin's placement in the Step-Down Program or the policies and procedures to which he was subject in the program. Nor did the grievance suggest that Griffin was experiencing any mental health issues as a result of being kept in solitary confinement. Consequently, the grievance did not "alert the prison to the nature of the wrong for which redress is sought" against Duncan, Robinson, Meyer, Fegan, and Mathena. Wilcox, 877 F.3d at 167 n.4 (quoting Strong, 292 F.3d at 650).

Although Griffin also filed a regular grievance requesting to speak to a psychologist, that grievance similarly failed to provide adequate notice of Griffin's current claims against the correctional officials allegedly responsible for implementing and administering the Step-Down Program. In that grievance, Griffin identified the individuals involved in the underlying incident as "mental health," and he alleged that he had not yet seen a psychologist. In the space for a suggested remedy, Griffin wrote: "I need to talk to a psychologist." Still Aff. Encl. C, ECF No. 24-4 at 31. While Griffin now claims that Duncan, Robinson, Meyer, Fegan, and Mathena knowingly caused him to suffer mental health issues as a result of their "policy of solitary confinement," his grievance against mental health staff for failing to provide timely access to a psychologist did not provide adequate notice of his policy-related claims against the named correctional officials. See, e.g., King v. Dart, 63 F.4th 602, 608 (7th Cir. 2023) (concluding that a grievance against medical staff failed to provide proper notice of an inmate's claim against a correctional officer); Griffin v. Arpaio, 557 F.3d 1117, 1121 (9th Cir. 2009) (holding that a grievance requesting a ladder to access the top bunk did not exhaust a claim that prison staff disregarded an order assigning the prisoner to a lower bunk).

In response to the defendants' motion, Griffin argues that he was not required to utilize the grievance procedure set forth in OP 866.1 to exhaust his claims against Duncan, Robinson, Meyer, Fegan, and Mathena, and that the "only avenue to address [his] placement in the Step-Down Program was through the procedure set out in . . . OP 861.1." ECF No. 33 at 4. However, the appeal process set forth in OP 861.1 must be used to appeal "a finding of guilt" by a disciplinary hearings officer or the "degree of any penalty imposed" by a

hearings officer for a disciplinary offense. OP 866.1 (eff. Sept. 1, 2023, amended Dec. 1, 2024) § XIV(A), Cordle Aff. Encl. A, ECF No. 26. Here, the hearings officer did not impose time in solitary confinement as a penalty for the disciplinary offenses for which Griffin was found guilty. Instead, the ICA recommended that Griffin's security level be changed to "S – Segregation" following a separate security level review conducted on December 19, 2024, and that recommendation was ultimately approved by Duncan and Meyer. Pl.'s Aff. Encl. G, ECF No. 33-4 at 110. Griffin acknowledges that the eligibility criteria for assignment to Security Level S and the Step-Down Program are set forth in a separate operating procedure, and OP 861.1 specifically provides that an inmate "must address any issues related to a perceived violation of any other operating procedure through the established inmate grievance process" outlined in "Operating Procedure 866.1." OP 861.1 § XIV(H)(4) (emphasis added). Likewise, while OP 866.1 provides that "[d]isciplinary hearing decisions, penalties and/or procedural errors" are not grievable through the regular grievance process and must be "appealed in accordance with Operating Procedure 861.1," other "[a]ctions of staff" that affect an inmate personally are grievable through the regular grievance process, as are an inmate's "[c]onditions of care under the authority of the DOC." OP 866.1 § III(B) (emphasis added).

For these reasons, the court concludes that Griffin was required to utilize the inmate grievance process set forth in OP 866.1 to exhaust the particular claims asserted against Duncan, Robinson, Meyer, Fegan, and Mathena in Claim 6. Because it is clear from the record that Griffin failed to exhaust his administrative remedies, summary judgment is appropriate with respect to these claims.

**2. Claim Against Holbrook, Still, Trent, and Meade**

In Claim 7, Griffin alleges that defendants Holbrook, Still, Trent, and Meade acted with deliberate indifference in violation of the Eighth Amendment by failing to provide him with a no-kneel pass. It is undisputed that Griffin submitted a regular grievance on February 21, 2025, in which he alleged that a degenerative spinal injury prevented him from kneeling, that he needed a no-kneel pass in order to shower and engage in other activities, and that Holbrook had improperly denied his request for a no-kneel pass. Although Still rejected that grievance at intake as a "Request for Services" and instructed Griffin to submit a "sick call" request, Griffin specifically alleged in the grievance that he had already "put a sick call form in concerning getting a 'no kneel' pass" and that Holbrook had denied his request. Still Aff. Encl. B, ECF No. 24-4 at 25–26. Additionally, the record includes a facility request form submitted to medical services several weeks earlier, on December 30, 2024, in which Griffin requested a "kneeling exemption" and a staff member responded that Griffin would be scheduled with a provider. Pl.'s Aff. Encl. E1-E6, ECF No. 33-4 at 99.

Construing the evidence in the light most favorable to Griffin, the court concludes that a genuine factual dispute exists as to whether Still "improperly rejected" Griffin's grievance at intake, "rendering administrative remedies unavailable." Tory v. Davis, No. 21-6649, 2022 WL 17716775, at *2 (4th Cir. Dec. 15, 2022). Courts have explained that a VDOC inmate who wishes to receive medical treatment or other services should first "submit a proper request for services through the proper prison channels" and that "if the

request for services is denied, [the inmate then has] the opportunity to pursue the claim through the informal complaint and regular grievance process." Prosha v. Coleman, No. 3:22-cv-00183, 2023 WL 5673442, at *9 (E.D. Va. Sept. 1, 2023) (internal quotation marks and alterations omitted). Here, unlike in Prosha, there is evidence indicating that Griffin "pursued a request for services that was denied and subsequently filed a Written Complaint and a Regular Grievance." Id. As the Fourth Circuit noted in Tory, OP 866.1 specifically provides that a regular grievance must be "accepted into the grievance process and appealed" in order to satisfy the exhaustion requirement. OP 866.1 § V(B). Therefore, if Griffin's grievance was improperly rejected at intake, rather than being accepted into the grievance process, "administrative remedies may have been unavailable" to him through no fault of his own. Tory, 2022 WL 17716775, at *2; see also Allen v. Shelton, 7:22-cv-00408, 2023 WL 6389807, at *2 (W.D. Va. Sept. 29, 2023) ("If the grievance department rejects a grievance for plainly incorrect (and indeed irrational) reasons, the administrative process was not available to the inmate 'through no fault of his own'") (quoting Moore, 517 F.3d at 725). Consequently, the court concludes that Holbrook, Still, Trent, and Meade are not entitled to summary judgment on the exhaustion defense raised in response to Claim 7.[2]

## IV. Conclusion

For the reasons stated, the defendants' motion for summary judgment, ECF No. 23, is **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**. The remaining defendants shall have 60 days to file any supplemental motion for summary

[2] Having ruled on the exhaustion arguments raised in the defendants' motion for summary judgment, the defendants' motions for a partial stay of discovery pending a ruling on the exhaustion arguments, ECF Nos. 36 and 37, will be denied as moot.

judgment addressing (1) the merits of the procedural due process claims set forth in Claims 1 through 5, including the applicable harmless-error analysis, and (2) the merits of the Eighth Amendment claim of deliberate indifference asserted in Claim 7.

An appropriate order will be entered.

Entered: August 19, 2026

Mike Urbanski
Senior U.S.
District Judge
2026.08.19
08:51:08 -04'00'

Michael F. Urbanski
Senior United States District Judge